Filed 2/22/16  In re Hunter S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re HUNTER S., a Person Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ASHLEE W.,<br><br>        Defendant and Appellant. | A143219<br><br>(Mendocino County Super. Ct. No. SC-UK-JV-SQ-14-1703601-001) |

In this dependency appeal, Ashlee W. (mother) seeks relief from the juvenile court's dispositional order removing her infant son, Hunter S., from her care pursuant to section 361, subdivision (c) of the Welfare and Institutions Code.[1]  Specifically, mother argues that the court's removal order was legally flawed in several respects and was not supported by substantial evidence.  In addition, mother claims that she was not adequately advised of her right to participate in a designated relinquishment of the minor.  Seeing no error requiring reversal of the juvenile court's dispositional order, we affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.  Hunter's presumed father, Ricky S. (father), has not appealed and is therefore not a party to these proceedings.

1

## I. BACKGROUND

On July 23, 2014, the Mendocino County Health and Human Services Agency (Department) filed a juvenile dependency petition pursuant to subdivisions (b) and (j) of section 300, alleging that Hunter S., the minor who is the subject of these proceedings, was at risk of harm due to his parents' substance abuse, his mother's parenting deficits, his father's criminal history and anger issues, the couple's abusive relationship, and the family's lack of stable housing. The previous month, the Department had responded to a hospital report expressing concerns about Hunter going home with his parents. The minor had been born premature—at 34 weeks—and spent 22 days in the hospital. He was not breathing when he was born and was placed in an incubator with a "CPAP" machine to assist him. Mother had tested positive for marijuana upon admittance to the hospital. Moreover, the parents appeared not to understand that the baby needed quiet because he was medically fragile. Once Hunter was moved to the parents' room, a nurse discovered a soft blanket near Hunter's face and other objects in the crib, all suffocation hazards. Further, the parents had to be roused from a deep sleep to feed the baby. This lack of vigilance was viewed as "especially alarming" because mother's first child had reportedly died of sudden infant death syndrome (SIDS) in 2001 at eight months old.[2]

In addition, mother had an open dependency case involving her two other children—Nash W. (born August 2006) and Brooklyn W. (born July 2008)—who had been detained on May 30, 2013, and then returned to her care on July 23, 2013, under a family maintenance plan.[3] The minors were re-detained on October 7, 2013, due to continued drug use by mother and father and lack of compliance with court-ordered services. As of the six-month review in May 2014, mother had failed to complete a mandated drug and alcohol assessment and had not engaged in court-ordered parenting

_____

[2] According to the record in this matter, prior to the infant's death, the police department had received a referral which indicated that mother had been sleeping in frequently, not getting up with the child when he woke up, and that she would let him cry "for hours on end."

[3] Hunter's father is not the father of mother's older children, but lived in the family home throughout this sibling dependency case.

classes. She continued to consistently test positive for marijuana, even while pregnant with Hunter. The juvenile court found that mother had made "minimal" progress towards alleviating or mitigating the causes necessitating placement of the minors. A 12-month review of mother's reunification efforts with respect to these half siblings was scheduled for October 30, 2014. Reportedly, however, mother and father stated to the social worker in July 2014, "that now they [had] a new baby they could move on with their lives and forget about [mother's] prior CPS case involving her two older children."

After Hunter was discharged from the hospital into his parents' care, both mother and father tested positive for marijuana on July 10, 2014. The social worker advised mother not to breastfeed Hunter if she was going to smoke marijuana. Mother agreed to stop using the drug, acknowledging the danger for her medically fragile infant. In addition, mother had signed a risk reduction plan shortly after Hunter's birth, agreeing, among other things, to engage in drug treatment, attend parenting classes, and keep in contact with the social worker. But, as in the sibling case, she was not following through.

Instead, both parents presented as hostile throughout the Department's contact with them. On or around July 10, 2014, for instance, father arrived at the Department's offices with mother and Hunter, screaming and shouting at the social workers and then "rapidly marching out" without permitting the social workers to speak. Of additional concern, the paternal grandmother, with whom the parents were living, had initially indicated that she would help out as a caregiver for Hunter. More recently, though, on July 9, 2014, she stated that she also smoked marijuana; did not want to be involved with the Department; and was not willing to oversee the minor's care. Thereafter, at a home visit on July 23, 2014, mother was found breastfeeding Hunter. She claimed that she was no longer using marijuana. When mother and father were tested that day, however, each tested positive for both marijuana and opiates. The Department responded by filing a dependency petition for Hunter and requesting detention of the minor.

At the initial hearing on July 24, 2014, the parents asked to continue the matter so that they could contest the Department's recommendation that Hunter be detained. The juvenile court allowed the continuance, but ordered Hunter temporarily detained in the

3

interim. In addition, the court advised the parents regarding the possible consequences of the dependency proceeding and indicated that it was "crucial" for the parents to get engaged in services in the first six months. Indeed, the court suggested that the parents could voluntarily start services immediately, even though they had not yet been court-ordered to do anything in Hunter's case.

At the continued detention hearing on July 29, 2014, mother presented testimony from Dr. Sterling, Hunter's pediatrician. Dr. Sterling indicated that—while there were some concerns when Hunter was in the hospital regarding the parents' understanding of the premature infant's needs—the parents were doing better by discharge and he had no concerns about Hunter's care during four subsequent well-child visits. With respect to breastfeeding while using marijuana, Dr. Sterling testified that, while they "definitely" recommend against it because it passes into the breast milk, he was not aware of any studies that definitively proved that it was harmful to the baby. Dr. Sterling believed in this case that he had advised the mother against marijuana use while breastfeeding. He stated that he generally advised parents not to have infants in a smoky environment.

A public health nurse (PHN) also testified regarding her contacts with the family. During a visit to the family home, the PHN observed an ashtray containing cigarette butts on the front porch and smelled cigarette and marijuana smoke inside of the residence. She was concerned because secondhand smoke exposure is a well-established risk factor, especially for premature infants. In addition, although mother told the PHN that she had never used marijuana, the PHN was aware that mother had tested positive for both marijuana and opiates. With respect to opiates, the PHN was worried because opiates in breast milk can cause "significant central nervous system depression in infants." As for the marijuana exposure, the PHN believed that anything not proven safe should be viewed with caution. Finally, the PHN also reported some nascent concerns regarding possible domestic violence between mother and father due to father's controlling behaviors, but nothing that rose to a level triggering her duties as a mandated reporter.

Mother next testified, providing evidence that she had received a prescription for hydrocodone in the hospital after Hunter's birth (over five weeks prior to her positive test

4

for opiates). Mother also described her living environment in the paternal grandmother's home, indicated that she had attended all of Hunter's scheduled medical appointments, and testified that Hunter was up to date with his immunizations. She additionally detailed her current attempts to find housing. Father then provided evidence of his own prescription for hydrocodone, due to a chronic back problem. Finally, the supervising social worker testified that the Department viewed the case as very high risk.

The juvenile court noted that the parents' level of cooperation seemed to be improving. It also indicated that—although there had been argument on the issue—the court had no actual evidence before it regarding mother's history of noncompliance with respect to her pending sibling case. The court then concluded: "Based primarily on the testimony of Dr. Sterling, I don't believe there's been sufficient evidence produced to show there's a substantial danger to the physical health of the child. However, I think services must be provided to protect that child between now and any further determinations of the Court. I'm not quite sure how to do that." Minor's counsel suggested that the court make return of the child contingent on various orders to the parents. Apparently following this suggestion, the court stated: "I'm going to order that the child be released to the parents on the conditions that the parents remain in the home of the grandmother . . . unless and until they have a separate home for themselves. [¶] That the mother, if she's going to breastfeed the child, she must abstain from any use of hydrocodone or marijuana." The court also ordered both parents to participate in random drug testing; ordered father to refrain from marijuana use and to participate in anger management classes; and ordered that "both parents participate in any childcare, infant care services that are requested by the Department."

On August 12, 2014, the court set the contested jurisdiction hearing for August 22. The Department indicated that it would again be raising the issue of detention at that contested hearing. In addition, it planned on filing a request for judicial notice prior to the hearing which identified specific documents from mother's sibling case for the court's consideration in Hunter's dependency. The Department did subsequently file its request for judicial notice on August 22, 2014, and the juvenile court granted the request

5

on that same date with respect to the identified findings and orders. With respect to the Department reports in the sibling case, it was agreed that the court could review them for purposes of the pending jurisdictional hearing.

In the meantime, the parties came to an agreement with respect to amended language for the petition, striking all but three allegations. The new language alleged (1) that father "has anger issues that inhibit his ability to make rational decisions for his infant child and places his child at risk of serious harm" and "is resistant and confrontational" with Departmental staff; (2) that mother's "continued use of marijuana and lack of follow-through with court-ordered life-skills and support services, and her failure to meet the needs of her children in the sibling case, places Hunter at serious risk of harm"; and (3) that "[t]he substantiated issues of neglect that led to the removal of [mother's] two other children in 2013 have not been resolved, leaving the newborn infant in the care of the parents at serious risk of harm and neglect." As part of the stipulated resolution, mother agreed to engage in domestic violence services, such as a women's empowerment group or individual counseling.

After both parents submitted the matter on the amended petition, the juvenile court determined the allegations in the amended petition to be true and found that Hunter was described by subdivisions (b) and (j) of section 300. The court then advised the parents that Hunter could be removed from their care at the dispositional hearing and admonished them as follows: "So you have been doing some things with the social worker. You've been letting her come in and see Hunter. You've been taking some referrals. Now is the time to really get serious about that. And if you want this case to go away quick, the only way to do it is cooperate with the social worker and do the things that she's asking you to do to address the problems that the court found true today." In this context, counsel for the Department stressed that the parents needed to keep the social worker advised regarding where they were living, as the Department was responsible for monitoring Hunter's safety.

Unfortunately, in its report for the September 2014 dispositional hearing, the Department detailed a pattern of behavior by the parents that could not be described as

6

cooperative. For example, although mother was assessed and referred to substance abuse treatment on August 11, 2014, she failed to attend. In addition, after testing positive for marijuana on August 7, 2014, she declined all further testing. Further, although mother enrolled in a parenting group and attended two of the eight weekly sessions, she had been absent for three consecutive weeks. She attended one session of another parenting class in mid-August. Moreover, mother did not engage in any domestic violence services as she agreed to do as part of the stipulation entered into at jurisdiction. Father, having been assessed and referred to substance abuse treatment, also declined to attend. Since being referred to treatment, he had only participated in one random drug test. And, although assessed as appropriate for an anger management group, father had not attended any sessions. Additionally, when contacted in July to schedule a one-time family team meeting after the jurisdictional hearing to do case planning for Hunter, the parents declined, saying they were " 'too busy' " and that it was a " 'burden to participate.' " Finally, they had not followed up with the PHN, despite agreeing to work with her to monitor Hunter's growth, development, and well-being.

Significantly, at the time of the dispositional report, the parents had not contacted the Department or returned phone calls or messages left by the social worker for two weeks. On August 16, 2014, they had left the paternal grandmother's home and moved to a motel without informing the social worker. Although "strongly reminded" to keep the Department apprised of any moves, the couple left the motel on August 25, 2014, again without informing the Department. The Department subsequently learned— through a telephone call from a concerned relative—that the parents had left Hunter with a paternal cousin and maternal aunt on August 25, stating that they were going to Reno to get married. The paternal cousin and maternal aunt lived in different units of the same duplex. According to the reporting relative caregiver, the parents had given her a diaper bag for Hunter which contained "dirty clothes, bottles with formula that had gone rancid,

diapers that were too large and a switch blade in the front pocket."[4]  As of August 27, 2014, the parents' cell phone was disconnected, leaving the caregivers with no way to reach the parents.

Father last contacted the social worker briefly by telephone on September 2, 2014, stating that they were not in Reno, but had instead gone to Willits due to the death of his father, Hunter's paternal grandfather.  The social worker subsequently learned that the couple had returned to see Hunter for one day on September 5, 2014, before again leaving for Reno to get married.  Reportedly, the parents eventually returned, having purchased new clothes with their cash aid, but without getting married.  According to the relative caregivers, father gave them his food stamp benefits card to buy food, and was unhappy to learn that they had used it instead to buy necessary formula for the baby.  On September 12, 2014, the social worker learned that the parents were now living in the upstairs unit of the duplex with the maternal aunt.  However, the baby remained with the paternal cousin in her downstairs unit every night.  Thus, the parents had not provided regular care for Hunter for a significant period.

In fact, the parents' pattern of noncompliance and poor judgment in Hunter's case was similar to that seen in mother's pending dependency for Hunter's two half siblings. Indeed, mother admitted that she had not engaged in substance abuse treatment in the sibling case, although it was ordered as part of her case plan.  With respect to parenting classes, mother did complete an intake support group as part of her case plan in the sibling case, but it took her 20 weeks to complete the eight-week program.  Mother's 12-month review hearing in the sibling case was scheduled for October 2014, and, according to the social worker, it "did not appear favorable in terms of [mother] reunifying with her children, whom she appears to have written off."

In Hunter's dispositional report, the social worker stressed that the parents had again declined to participate in the support services identified for them—services that

---

[4] The parents did provide the relative caretakers with written authorization to seek emergency medical care for Hunter if necessary.

would have provided "much needed parenting and life-skills" as well as "supports and monitoring of their sobriety." They had, in sum, failed to cooperate "on any level" or even to stay in regular contact with the Department. Under such circumstances, the social worker felt that nothing further could be done to keep Hunter safe short of removal from parental custody. Indeed, the Department believed that Hunter would be "vulnerable, subjected to ongoing instability, and at high risk of serious harm if left in the care of the parents." The social worker therefore recommended removal and implementation of a family reunification plan.

At the dispositional hearing on September 23, 2014, both parents initially failed to appear. However, during a brief recess, the social worker found the parents at their home and brought mother to court. Father declined to attend. Counsel for both parents asked for a continuance due to father's absence, but the court denied the motion, seeing no good cause. The parents then contested the Department's recommendation that Hunter be removed from their care. Mother testified regarding her contacts with the social worker and her engagement in services. Mother acknowledged that Hunter's release to her at the detention hearing had been conditioned upon her engagement in services. She claimed that her efforts in this regard had been hampered by the loss of her phone and a medical condition. Mother, however, further testified that she did not go to social services to contact the social worker because, in her opinion, she didn't need one. She also stated that she did not complete her substance abuse assessment because she did not feel she was a drug addict.

Both the Department and Hunter's attorney argued in favor of detention and a family reunification plan due to the family's history of noncooperation. Mother's attorney, in contrast, argued that mother had reasonably complied with services and that the recommendation for detention was not based on risk to the child. In the end, the juvenile court concluded that the Department had met its burden by clear and convincing evidence that continuing in the home of the parents was "not appropriate to protect Hunter." Specifically, the court opined: "This is a premature baby born to a mother that was already in family reunification with two older children. And the record shows that

9

she had not been regularly participating or benefiting from the services in the siblings' case. [¶] Initially the Department detained Hunter, but with services in place the judge at detention felt it was safe and appropriate to release Hunter to his parents; however, the evidence established by the [Department] in the disposition report is that the parents have not regularly engaged in services, and have not maintained contact with the social worker . . . ." The court therefore removed Hunter from the parents' care and ordered a plan of family reunification.

A timely notice of appeal from mother brought the matter before this Court.[5]

## II. DISCUSSION

### A.    *Removal Order*

Pursuant to section 361, subdivision (c)(1), a dependent child may not be taken from the physical custody of the parents with whom the child resided at the time a dependency petition was initiated unless the juvenile court finds by clear and convincing evidence both (1) that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home"; and (2) that "there are no reasonable means by which the minor's physical health can be protected without removing the minor" from the parents' physical custody. (§ 361, subd. (c)(1).) When determining risk, the juvenile court may consider a parent's past conduct as well as his/her present circumstances. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126 (*John M.*).) However, "[t]he parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate." (*In re*

---

[5] We have reviewed the materials provided to us via the Department's April 2, 2015, motion to augment the record, which we granted in full that same day. We find these additional documents—which detail mother's progress after the dispositional hearing here at issue—irrelevant to the determination of this appeal and therefore do not discuss or consider them in rendering our decision.

*Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*).)  Rather, "[t]he focus of the statute is on averting harm to the child."[6]  (*Cole C.,* at p. 917.)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order."  (*In re Javier G.* (2006) 137 Cal.App.4th 453, 462 (*Javier G.*).)  When a dispositional order removes a child from parental custody, our review is for substantial evidence, bearing in mind the heightened burden of proof in the juvenile court.  (*John M.*, *supra,* 212 Cal.App.4th at p. 1126; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)  In other words, in considering a challenge to an order removing a dependent child from his or her parent, we must " 'view the record in the light most favorable to the order and decide if the evidence is reasonable, credible and of solid value.' "  (*Javier G.*, at pp. 462–463.)  Further, we must "draw all reasonable inferences from the evidence to support the findings and orders of the dependency court."  (*Ibid.*)

Mother attempts to avoid this admittedly daunting standard of review by identifying alleged "legal errors" committed by the juvenile court in making its removal decision, errors which would, in contrast, be subject to our de novo review.  (See *In re T.G.* (2015) 242 Cal.App.4th 976, 987.)  For instance, mother asserts that the court made a legal error by assuming that the parents were not entitled to delegate Hunter's care to an appropriate caretaker while disposition was pending.  To support this claim, she launches into an extended legal analysis regarding the exact nature of Hunter's release from detention at the July 29, 2014, detention hearing and its impact on the parents retained custodial rights to Hunter, including the right to chose an alternate caregiver for the

---

[6] Citing *Cole C.*, *supra*, 174 Cal.App.4th at page. 917, a number of cases in this area have asserted that the jurisdictional findings are "prima facie evidence" that the child cannot safely remain in the home."  (See, e.g., *In re T.V.* (2013) 217 Cal.App.4th 126, 135; *John M.*, *supra*, 212 Cal.App.4th at p. 1126.)  We note, however, that this is true only when jurisdiction is established pursuant to subdivision (e) of section 300, a relatively rare occurrence not applicable in this case.  (See § 361, subd. (c)(1); see also § 300, subd. (e) [authorizing juvenile dependency jurisdiction for children under five who have suffered "severe physical abuse"].)

minor.  We find mother's argument not only analytically flawed, but also entirely beside the point.  The clear import of the juvenile court's detention order was that, while the Department had made the necessary prima facie showing and danger to the minor existed, the risk to the child could be mitigated through the provision of predispositional services.  The minor was thus conditionally released pursuant to subdivision (d)(2) of section 319.[7]  This fact, however, and the legality of the parents' subsequent delegation of Hunter's care, were not particularly relevant to the juvenile court's removal finding.  Indeed, while the court commented at disposition that the parents had not been caring for Hunter for a "good part of the time" since the infant's release from custody, it did so merely in order to find not credible mother's conflicting testimony that they had only left Hunter for one night.  Neither the court nor any party suggested that the parents did not have the legal right to leave Hunter with an alternate caregiver or that this circumstance, in itself, supported a finding of substantial danger to the minor.  There was no argument that the paternal cousin was not properly caring for Hunter.  Rather, if anything, mother's legal right to remove the minor from his current caregiver at her whim was the more worrisome issue, as it added to the instability—and therefore risk—in the young minor's life.

Mother additionally claims that the juvenile court committed legal error by concluding at the dispositional hearing that the parents had not "regularly engaged in services."  She argues that there is no statutory basis for ordering a parent to "regularly" engage in child welfare services prior to disposition and that no predispositional statute permits a failure to participate and make substantive progress in such services to be used as a prima facie basis for removal.  (Compare §§ 366.21, subds. (e) & (f), 366.22, subd. (a).)  Of course, as just mentioned, section 319, subdivision (d)(2), does expressly

---

[7] Pursuant to subdivision (d)(1) of section 319, the juvenile court must determine whether there are available services which would prevent the need for further detention of the minor.  "If the child can be returned to the custody of his or her parent or guardian through the provision of those services, the court shall place the child with his or her parent or guardian and order that the services shall be provided."  (§ 319, subd. (d)(2).)

12

authorize the juvenile court to order predispositional services as a means of avoiding detention. More importantly, however, we again find mother's argument largely irrelevant. At the detention hearing at which Hunter was returned to his parents' care, the juvenile court—even without any evidence of mother's lack of progress in her sibling case—was adamant that "services must be provided to protect [Hunter] between now and any further determinations of the Court." The clear implication is that, without such services, the minor would be at risk. In fact, mother had signed a risk reduction plan shortly after Hunter's birth, agreeing, among other things, to engage in drug treatment, attend parenting classes, and keep in contact with the social worker, all in order to "maintain the safety" of the minor. And, at the dispositional hearing, mother testified that she understood that Hunter's release to her at the detention hearing had been conditioned upon her participation in services. Ultimately, however, whether mother's engagement in these predispositional services was purely voluntary or was somehow "required" pursuant to court compulsion or statutory mandate is not dispositive. Rather, the crucial issue with respect to substantial danger to the minor is whether mother had, in fact, participated and benefitted from those services, thereby reducing the risk of physical harm to Hunter. The juvenile court found that she had not.

Once the "legal" red herrings advanced by mother are dismissed, it is clear that there is more than substantial evidence supporting both prongs of the juvenile court's removal order in this case. First, with respect to the court's substantial danger finding, the record reflects that mother had a long-term substance abuse problem that interfered with her ability to properly care for both Hunter and his older half siblings. Yet, despite the imminent likelihood that she was going to permanently lose custody of her two older children, she remained persistently unwilling to treat this issue. In addition, the Department had consistently opined that mother's lack of judgment and poor parenting practices placed all three of her children at risk. Some examples during Hunter's case included exposing the premature infant to secondhand smoke; allowing blankets and other suffocation hazards in Hunter's sleeping environment, despite previously having a child that died of SIDS; sleeping through the feeding time for the medically fragile baby;

13

and failing to provide the relative caregiver with adequate supplies for Hunter or a means to contact the parents if necessary. Again, however, mother refused to engage in services that might mitigate this risk. During her sibling case, it took her 20 weeks just to complete an introductory eight-week parenting class. Mother's engagement in parenting education after Hunter's petition was filed was no better. Finally, the parents' chaotic lifestyle and unwillingness to maintain contact with the Department or other service providers so that Hunter's safety could be effectively monitored added significantly to the risk associated with maintaining this premature infant in his parents' care.

Second, we reject mother's contention that the juvenile court's "no reasonable means" finding lacked sufficient evidentiary support. Indeed, it is difficult to imagine what more the Department could have done in this case to reduce the risk to Hunter in the face of the parents' blatant refusal to cooperate and engage in the necessary services offered to them, both in Hunter's dependency and in the pending dependency action involving his half siblings. Although mother argues that her compliance with services during the predispositional timeframe was sufficient, citing extenuating circumstances such as the death of the paternal grandfather, the loss of her phone, and a medical condition, we are not persuaded. Rather, we think mother's comments at the dispositional hearing—that she did not contact the social worker because she did not need one and did not engage in drug treatment because she was not a drug addict—are more telling and evince a deep-seated refusal to acknowledge that she had any issues requiring juvenile court intervention. Thus, mother was failing to comply with services, not due to some unanticipated roadblocks, but because she did not believe that they were necessary. And her long-term failure to engage over two dependency proceedings indicated that her attitude was unlikely to change. Under such circumstances, it was eminently reasonable for the juvenile court to conclude that Hunter could not safely be maintained in his mother's care in hopes that she might suddenly decide to change her ways and positively engage in Departmental services and the juvenile court process. (Cf. *John M.*, *supra*, 212 Cal.App.4th at pp. 1126–1127.)

14

**B.** *Advisement of Relinquishment Rights*

Mother finally urges us to reverse the juvenile court's dispositional order because she was not adequately advised of her right to participate in a designated relinquishment for Hunter. It is true that "[p]arents of a dependent child under court jurisdiction pursuant to section 300 retain the right to voluntarily relinquish their child for adoption." (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1303 (*R.T.*).) Moreover, social service agencies are required to advise parents of this option. (*Id.* at pp. 1303–1304.) Specifically, in accordance with subdivision (g) of section 358.1, a social services agency's dispositional report must state "[w]hether the parent has been advised of his or her option to participate in adoption planning . . . and to voluntarily relinquish the child for adoption if an adoption agency is willing to accept the relinquishment." (See *R.T.,* p. 1304; Cal. Rules of Court, rule 5.690(a)(1)(B)(iii) [report should contain "a statement" that each parent has been advised regarding adoption planning and voluntary relinquishment and the parent's response].)

Here, mother's argument must fail, however, because the Department complied with the advisement requirement set forth in section 358.1. In its September 2014 dispositional report, the Department stated: "The parents were not open to the option of voluntary relinquishment when initially questioned prior to the Jurisdictional hearing." Rather, the parents had stated that they wished to keep Hunter with them and were willing to participate in services in order to make that possible. Although the Department was unable to get more current information from the parents about their wishes, this was due to the parents' failure to maintain contact with the social worker rather than any deficit in the Department's performance of its duties. Thus, the record clearly reflects that the option of voluntary relinquishment was discussed with mother and that she was not interested.[8]

---

[8] The fact that father requested information in a September 2, 2014 phone call regarding "what it would take to give guardianship of Hunter to his cousin or to the mother's sister" does not change this analysis. A relative guardianship is a less permanent arrangement than an adoption and is not covered by the voluntary

In the face of this evidence of compliance, mother argues that the Department's notification as reflected in the dispositional report was inadequate because it was required to be in writing and to contain certain specific language regarding the parents' relinquishment rights. We are not persuaded. First, mother's reliance on section 309, subdivision (e), regarding the requirement of a *written* notification, is inapposite as that statute relates to a different notification, one required to be sent to extended family members whenever a child is removed. (See § 309, subd. (e)(1)(B); *R.T., supra*, 232 Cal.App.4th at p. 1296.) Next, mother cites *R.T.* in support of her position. However, while *R.T.* discusses generally the requirement that parents be advised regarding voluntary relinquishment, it does not mandate that any particular language be included in the dispositional report with respect to the specifics of the advisement given beyond that required by section 358.1, subdivision (g) itself. (*R.T.,* at pp. 1303–1304.) Finally, since there was no indication that the Department's relinquishment advisement as described in the dispositional report was improper—and mother did not even argue the issue before the juvenile court—this is not a situation where the juvenile court failed to provide adequate oversight of the Department's relinquishment process as discussed in *R.T.*[9] (*R.T.* at pp. 1304–1308.) In short, there was no error.

## III. DISPOSITION

The judgment is affirmed.

---

relinquishment statutes. That father, at that point, might have been contemplating permanent out-of-home care options for the minor does not change the reality that the parents had been previously and properly advised regarding their relinquishment rights.

[9] Indeed, although unnecessary to our resolution of this matter, we note that, as mother failed to challenge the adequacy of the dispositional report in the juvenile court, she has also likely forfeited this issue. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 & fn. 2, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338–1339; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411–413.)

_____
REARDON, Acting P. J.

We concur:


_____
RIVERA, J.


_____
STREETER, J.